UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

Case No. _8:00-CV-2013-T-26F_

| | |
|---|---|
| MURREL NEAL, On Behalf of Himself and All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>INSURANCE MANAGEMENT SOLUTIONS GROUP, INC., GEOTRAC OF AMERICA, INC., BANKERS INSURANCE GROUP, INC., VENTURE CAPITAL CORPORATION, DAVID K. MEEHAN, JEFFREY S. BRAGG, DANIEL J. WHITE, ROBERT M. MENKE, ROBERT G. MENKE, JOHN A. GRANT, JR., WILLIAM D. HUSSEY, E. RAY SOLOMON, ALEJANDRO M. SANCHEZ, Individually, and RAYMOND JAMES & ASSOCIATES, INC., and KEEFE, BRUYETTE & WOODS, INC., Individually, and as Representatives of the Defendant Underwriter Class<br><br>Defendants. )| DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT FOR
## VIOLATIONS OF FEDERAL SECURITIES LAWS

### INTRODUCTION AND OVERVIEW

**Summary**

1.     This is a securities class action on behalf of purchasers of Insurance Management

Solutions Group, Inc. ("INMG") common stock pursuant and/or traceable to INMG's February

11, 1999 initial public offering (the "IPO" or the "Offering"). Together with its affiliate, Geotrac

of America, Inc. ("Geotrac" and together with INMG, the "Company"), INMG purports to be an

outsourcing provider of business process solutions and flood-mapping services designed to serve

insurance companies and financial institutions nationwide.

2.     On February 11, 1999, INMG completed an IPO of 3.35 million shares of

common stock at a price of $11.00 per share, pursuant to a Registration Statement and

Prospectus (collectively, the "Prospectus") filed with the Securities and Exchange Commission

T006515
$150.00

(the "SEC"). As a result of the IPO, the Company, including the "Selling Shareholder," Venture Capital Corporation, raised a total of $36.85 million in gross proceeds. Of this amount, over $2.57 million was paid to the underwriters.

3. In the Prospectus and in presentations and oral statements made in connection with the Offering (the "Roadshow Presentations") the defendants issued false and misleading statements representing that the Company was successfully assimilating its two primary lines of business, and that INMG was realizing synergies between these purportedly overlapping but independent businesses and was well positioned to execute its growth strategy. Defendants' representations enabled INMG and its insiders to raise almost $37 million from plaintiff and the Class through the sale of INMG common stock.

4. To accomplish the Offering, INMG contacted defendants Raymond James & Associates, Inc. and Keefe, Bruyette & Woods, Inc. (collectively, the "Lead Underwriters") for the purpose of having them arrange a syndicate to underwrite a public offering of INMG common stock (together with the Lead Underwriters, the "Defendant Underwriter Class"). After discussions with representatives of these underwriters, INMG's Chairman, CEO and President, David K. Meehan, was satisfied that the underwriters would help merchandise INMG stock by way of preparing and disseminating positive statements in the pre-offering Roadshow Presentations, in selling sheets used by employees of the underwriters to sell INMG stock and in the Registration Statement and Prospectus.

5. Before participating in the Offering, the underwriters requested that INMG insiders confirm that they were covered by directors' and officers' insurance and had INMG and its insiders agree that INMG would indemnify and hold the underwriters harmless from any attempt to hold them liable for violations of state and/or federal securities laws by the underwriters in connection with the Offering. Because INMG was able to raise approximately $37 million from the Offering, the underwriters ensured themselves of a large financial buffer to protect them from any adverse consequences arising out of any violations of the securities laws, thus providing the underwriters with little or no incentive to conduct a proper due diligence

investigation. Directly and through their agents, by drafting, preparing and/or reviewing the documents necessary to complete the Offering and by merchandising INMG stock, the underwriters completed the Offering raising $37 million by selling 3.35 million INMG shares at $11.00 per share.

6.      Unbeknownst to the public shareholders who purchased INMG stock pursuant to or traceable to the Offering, however, the Company's Prospectus was materially false and misleading. *As defendants later admitted, the Prospectus failed to disclose that INMG's flood mapping and flood zone determination subsidiary, Geotrac, was not compatible with the Company's other line of business and, as a result, could not be operated profitably or be integrated into the Company*. On or about September 29, 1999, plaintiff and the Class first began to learn this truth about the Company when INMG warned of extremely disappointing third quarter 1999 financial results, caused in substantial part by the under-performance of Geotrac.

7.      On October 28, 1999, the Company also announced it had retained Raymond James (the same firm that was: (1) a Lead Underwriter in the IPO; and (2) assisted in selling Geotrac to INMG shareholders) to sell the Company's flood mapping and flood zone determination business. In addition, at that time INMG's new acting President, David M. Howard, also made the shocking admission that the reason the Company was selling the flood mapping service business was because *Geotrac had "never fit with the outsourcing business*," and that Geotrac would "have 'better synergies' if linked to a mortgage provider" not an insurance outsourcing service provider.[1] It was only then that defendants finally admitted that INMG's two lines of business – its flood mapping and flood zone determination business (represented by Geotrac) and its insurance outsourcing services business – had been a *"strategic misfit from the start*."

8.      Defendants admission that the Geotrac assets were incompatible with the Company's other line of business was completely contrary to the representations made during the

---

[1]Here, as elsewhere, emphasis has been added unless otherwise indicated.

Roadshow Presentations and contained in the Prospectus, which stated that the Geotrac flood mapping services were central to both INMG's present business model and the Company's plans for future growth and success. Defendants' disclosure regarding the incompatibility of the flood mapping and flood zone determination subsidiary with the rest of the Company confirms that the positive statements regarding Geotrac made during the Roadshow Presentations and contained in the Prospectus were false when made.

9.       Defendants' belated disclosure of the true condition of the Company also had a material adverse impact on the price of INMG common stock. The Company's stock, which was offered at $11.00 per share and which traded as high as $11.88 per share the day of the Offering, *dropped to as low of $2.00 per share* as the Company revealed to investors that its two lines of business had not been compatible and that defendants planned to sell Geotrac because it "never fit" into the Company's business model. This decline represents a loss of over 80% of the value of the public shareholders' initial investment in the Company. According to the *St. Petersburg Times*, this decline also marked the Company for distinction as "*worst performing IPO this year*."

10.      Public investors who purchased shares pursuant and/or traceable to the Offering Prospectus and who paid an artificially inflated price for shares of INMG stock have suffered tens of millions of dollars in damages.

## JURISDICTION AND VENUE

11.      The claims asserted arise under §§11, 12 (a)(2) and 15 of the Securities Act of 1933 (the "1933 Act"). Jurisdiction is conferred by §22 of the 1933 Act. Venue is proper pursuant to §22 of the 1933 Act as defendant INMG and/or the Individual Defendants conduct business in and the wrongful conduct took place in this District.

## THE PARTIES

12.      Plaintiff Murrel Neal, purchased shares of INMG common stock pursuant or traceable to the Company's Prospectus, including those detailed in the attached Certification incorporated herein by reference, and was damaged thereby.

- 4 -

13.     According to the statements made by the Company, defendant INMG, together with its affiliate, defendant Geotrac, purports to be an outsourcing provider of business process solutions designed to serve insurance companies and financial institutions nationwide. INMG common stock traded in an efficient market on the Nasdaq National Market System during the Class Period.

14.     Bankers Insurance Group, Inc. ("BIG"), purports to be a diversified group of property and casualty insurance companies with principal lines of business including flood, homeowners and automobile insurance. BIG is, and at all times was, the Parent of the Company and following the Offering, BIG owned approximately 62.7% of the Company's common stock. Due to BIG's dominance and control over the Company, BIG was able to and did hand-pick the senior management of INMG both prior to and following the Offering. In addition, as a result of the Offering, BIG received direct and indirect benefits valued at over $100 million.

15.     Defendant Venture Capital Corporation ("Venture Capital") is a Cayman Islands corporation wholly owned by Venture II Trust, a discretionary charitable trust. In connection with the Offering defendant Venture Capital sold 1.35 million shares of INMG common stock, to realize gross proceeds of approximately $14.85 million.

16.     (a)     Defendant David K. Meehan ("Meehan") was, and is, Chairman of the Board, Chief Executive Officer and a director of INMG. At the time of the Offering, defendant Meehan was also President of the Company. In addition, both prior to and following the Offering, defendant Meehan served as Vice Chairman of the Board of Directors of BIG. Defendant Meehan signed the false and misleading Registration Statement issued in connection with the Offering.

(b)     Defendant Jeffrey S. Bragg ("Bragg") was and is Executive Vice President, Chief Operating Officer and a director of INMG. Bragg signed the false and misleading Registration Statement issued in connection with the Offering.

(c)     Defendant Daniel J. White ("White") was and is President and Chief Executive Officer of Geotrac, and a director of the Company. Defendant White signed the false

- 5 -

and misleading Registration Statement issued in connection with the Offering.[2]

(d)     Defendant Robert M. Menke ("R.M. Menke") was and is a director of the Company and in that capacity signed the false and misleading Registration Statement issued in connection with the Offering.  In addition, both prior to and following the Offering, defendant R.M. Menke served as President and Chairman of the Board of BIG.

(e)     Defendant Robert G. Menke ("R.G. Menke") was and is a director of the Company and in that capacity signed the false and misleading Registration Statement issued in connection with the Offering.  In addition, both prior to and following the Offering, defendant R.G. Menke served as Executive Vice President of BIG.

(f)     Defendant John A. Grant, Jr. ("Grant") was and is a director of the Company and in that capacity signed the false and misleading Registration Statement issued in connection with the Offering.

(g)     Defendant William D. Hussey ("Hussey") was and is a director of the Company and in that capacity signed the false and misleading Registration Statement issued in connection with the Offering.

(h)     Defendant E. Ray Solomon ("Solomon") was and is a director of the Company and in that capacity signed the false and misleading Registration Statement issued in connection with the Offering.

---

[2]The Company has entered into a Corporate Governance Agreement with Geotrac and defendant White setting forth certain terms and conditions pertaining to the operation of Geotrac following the Geotrac acquisition. The Corporate Governance Agreement provides, in part, that for so long as defendant White is a shareholder of the Company or Geotrac or has an option to purchase Geotrac stock, (i) the Company will vote all of its shares of Geotrac stock to fix and maintain the number of Geotrac directors at five, (ii) the Company will vote its shares of Geotrac stock to elect as directors of Geotrac two persons designated by defendant White, (iii) defendant White's termination as a Geotrac employee will require the vote of four out of five members of the Board of Directors, and (iv) certain actions by Geotrac will require the unanimous approval of the Geotrac Board of Directors, including any merger or consolidation, the payment of management or similar fees to the Company, or its subsidiaries or affiliates, the sale or issuance of Geotrac stock, and the sale of Geotrac assets outside the ordinary course of business to anyone other than an affiliate of Geotrac. Defendant White also has a right of first refusal to purchase the assets of Geotrac in the event such assets are to be sold. The Corporate Governance Agreement therefore allows defendant White to block certain transactions involving Geotrac even if such transactions are approved by all of the other directors of Geotrac and may be in the best interest of the Company and its shareholders.

(i)     Defendant Alejandro M. Sanchez ("Sanchez") was and is a director of the Company and in that capacity signed the amendments to the false and misleading Registration Statement issued in connection with the Offering.

17.     The above individuals are the "Individual Defendants."  They are each liable for the false statements pleaded in ¶¶37, 39, 41 and 43, as those statements were "group-published" information.

18.     Defendants BIG, Meehan, R.M. Menke, R.G. Menke and White, by reason of their stock ownership and/or positions with the Company, were controlling persons of INMG and are, therefore, liable under §15 of the 1933 Act for damages related to the allegations pled herein.

19.     Defendants Raymond James & Associates, Inc. ("Raymond James") and Keefe, Bruyette & Woods, Inc. ("KB&W"), the Lead Underwriter Defendants, are investment banking firms which specialize, *inter alia*, in underwriting public offerings of securities.  These firms served as Lead Underwriters of the INMG Offering and acted as representatives of the entire syndicate of investment banking firms, including the Lead Underwriters, in helping the Company sell millions of shares of INMG stock to the public at an artificially inflated price, for which they received over $2.579 million in underwriting fees.  In connection with the Offering, the Lead Underwriter Defendants had access to INMG and its senior officers and thus had access to and/or obtained INMG's internal corporate information, including the adverse information omitted and/or misrepresented, as alleged herein.  Most, if not all, of the members of the Defendant Underwriter Class were also market-makers in INMG stock and subsequent to the Offering purchased and sold INMG stock on a daily basis.  Because of their close association with INMG, the Defendant Underwriter Class had constant access to INMG's internal corporate information, including the adverse information omitted by defendants.

20.     The Defendant Underwriter Class directly and through their agents and representatives, assisted INMG and the Individual Defendants in planning the Offering, and purportedly conducted an adequate and reasonable investigation into the business and operations

of INMG, an undertaking known as a "due diligence" investigation.[3] The due diligence investigation was required of the Lead Underwriter Defendants in order to engage in the Offering.  Prior to the Offering, in the course of the investigation, the underwriters and their agents met with representatives, employees and agents of INMG, including its senior officers and directors, and reached understandings as to: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering; (iii) the language to be used in the Registration Statement and Prospectus; (iv) what disclosures about INMG would be made in the Prospectus; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As underwriters of the Offering, each member of the Defendant Underwriter Class caused the Prospectus to be delivered to potential and actual purchasers of INMG common stock in connection with offers and sales thereof.

## BACKGROUND

### The Company

21.    INMG is a holding company that was incorporated in the State of Florida in December 1996 by its parent, Bankers Insurance Group, Inc. ("BIG" or the "Parent"), which contributed to INMG two of its wholly owned operating subsidiaries, Insurance Management Solutions, Inc. ("IMS") and Bankers Hazard Determination Services, Inc. ("BHDS"), which were previously formed in August 1991 and June 1988, respectively.  In July 1997, the Company acquired a 49% interest in Geotrac, Inc. and in July 1998 acquired the remaining 51% interest. Geotrac was subsequently merged into BHDS with the surviving entity being known as Geotrac of America, Inc. (together with INMG and IMS, "INMG" or the "Company").  Thus, at the time of the Offering, INMG purported to have at least 18 months of experience managing both

---

[3]The Defendant Underwriter Class consists of at least the following entities (in addition to Raymond James and K, B&W:  Bear, Stearns & Co. Inc.; BT Alex. Brown Incorporated; CIBC Oppenheimer Corp.; Donaldson, Lufkin & Jenrette Securities; Hambrecht & Quist LLC; ING Baring Furman Selz LLC; Lehman Brothers Inc.; Morgan Stanley & Co. Incorporated; Prudential Securities Incorporated; Salomon Smith Barney Inc.; SG Cowen Securities Corporation; Warburg Dillon Read LLC; Conning & Co.; Fox-Pitt, Kelton Inc.; Hanifen, Imhoff Inc.; William R. Hough & Co.; Piper Jaffray Inc.; The Robinson-Humphrey Company, LLC; SoundView Technology Group, Inc.; and Southwest Securities, Inc.

Geotrac and the insurance service business, and at no time prior to the Offering did INMG disclose any problems related to integrating the two businesses.

22.     Historically, the majority of the Company's revenues and earnings have come from providing services and products to BIG. In fact, prior to 1997, the Company's outsourcing services principally related to information technology services provided to BIG on a cost reimbursement basis. In 1997, the Company entered into service arrangements with BIG to provide services primarily consisting of policy and claims administration (including policy issuance, billing and collection functions, claims adjusting and processing) and information technology services provided for BIG's flood and homeowners insurance lines of business. By 1998, BIG accounted for approximately 56% of the Company's total revenues. Thus, prior to and after this Offering, BIG was intimately familiar with the operations of INMG, and INMG was substantially dependent on the business of BIG's affiliated insurance companies.

**Business of INMG**

23.     According to the Company's Prospectus, at the time of the Offering, INMG purported to operate in *two* major business segments: (1) the Company claimed to provide outsourcing services to the property and casualty insurance industry with an emphasis on flood insurance; and (2) the Company claimed to provide flood zone determinations primarily to insurance companies and financial institutions. The Company's outsourcing services include policy and claims administration (policy issuance, billing and collection functions, claims adjusting and processing) and information technology services. The Company's flood zone determination services are provided by Geotrac. At the time of the Offering, the Company stressed the importance of its flood zone determination and flood mapping business.

**Flood Zone Determination Business**

24.     According to the Company, for a fixed fee it is able to provide customers – typically mortgage loan originators or insurance companies – with a determination as to whether a specified property is located within a federally designated flood zone classification. Determinations are purportedly made using the Company's proprietary national flood zone

database.[4]  At the time of the Offering, management estimated that over 85% of U.S. households

are located in counties covered by the Company's electronic flood zone database.  Moreover, at

the time of the Offering management also estimated that ***approximately 75% of all***

***determinations requested from the Company could be performed using automated flood zone***

***determinations in a matter of seconds, and that due to the ongoing automation of the***

***Company's flood zone database this number was increasing***.

25.     Thus, at the time of the Offering, the flood zone determination business was

especially significant to investors in analyzing the Company's prospects and profitability because

much of this business was fully automated, such that incremental revenue growth could

purportedly be obtained with very little additional capital cost or investment.  The automated

flood zone determinations cost less for the Company to perform than manually generated

determinations and, therefore, purported growth in this line of business represented a significant

growth opportunity for the Company.  In addition, defendants consistently stated that INMG

could use its customer bases in each line of business to cross-sell products and services, thereby

making the two lines of business central to INMG's growth plans.

**BIG Ownership of INMG Prior to and After the IPO**

26.     Prior to the Offering the Company was a 74.4% owned subsidiary of BIG.  BIG is

the largest underwriter of flood insurance policies through independent agents (and the second

largest overall) in the United States.  Prior to and at the time of the Offering, BIG was the

Company's principal customer, accounting for approximately 75.6% (on a historical basis) and

56.4% (on a pro forma basis) of the Company's total revenues and 98.0% (on both a historical

basis and a pro forma basis) of the Company's outsourcing revenues in 1997, and 56.2% and

96.8% of the Company's total revenues and outsourcing revenues, respectively, for the nine

months ended September 30, 1998.  As a result of the Offering, BIG reduced its beneficial

---

[4]This database, which is continually updated, allows the Company to determine if a particular
structure is located within the special flood hazard areas established by the Federal Emergency
Management Agency ("FEMA").  These determinations assist mortgage lenders in complying with
federal regulations under which they must require borrowers to purchase the appropriate level of
flood insurance.

ownership in the Company to 62.7%, and obtained both cash and non-cash benefits totaling over $100 million.

**BIG Direct and Indirect Benefits from the Offering**

27.     According to the Prospectus, BIG benefitted both directly and indirectly from the occurrence of the INMG IPO – a conservative valuation of this combined benefit is over $100 million.  The following summarizes the significant benefits which accrued to BIG as a result of the Offering:

•       Following the Offering, the value of the 7,950,000 shares of common stock of INMG owned by BIG, which shares were acquired at a cost of approximately *$135,000*, had a value of approximately *$87.4 million*, or a *64,700% increase*.

•       As part of the Offering, the Company was to repay a note payable to Bankers Insurance Company (a wholly owned subsidiary of BIG), which note had an outstanding balance of *$2,353,424* at September 30, 1998, bore interest at 8.5% and matured in April 1999.

•       As part of the Offering, a wholly owned subsidiary of the Selling Shareholder agreed to loan *$12.0 million* to BIG in exchange for a subordinated note. BIG agreed with the Company to use a portion of such loan proceeds to satisfy outstanding accounts and a note payable to the Company totaling approximately $11.3 million at September 30, 1998.  The Company, in turn, agreed with BIG to use a portion of the funds received from BIG to satisfy accounts, income taxes and notes payable to BIG. As of September 30, 1998, the Company's accounts, income taxes and notes payable to BIG totaled approximately *$10.9 million*.

## SUMMARY OF ACTION

28.     INMG was offered to public investors as a company which was aggressively pursuing *two* complementary lines of business.  According to the Prospectus, the two lines of business presented significant growth opportunities for the Company and provided significant synergies, including cross-marketing and sales opportunities.  Those two purportedly inter-related lines of business include, (1) comprehensive policy and claims outsourcing services to the property and casualty insurance industry, with an emphasis on providing these services to the flood insurance market, and (2) flood mapping and flood zone determinations to financial institutions, mortgage lenders and insurance companies.[5]  The Company's outsourcing services

---

[5] A flood zone determination is necessary in order to ascertain a property's flood zone classification. In addition, due to more stringent underwriting criteria, P&C insurers increasingly require flood zone determinations prior to issuing commercial property policies.

include policy administration, claims administration and information technology services.

29.     At the time of the Offering the Company portrayed itself as being uniquely well situated to take advantage of then-current and foreseeable demand for *both* flood insurance outsourcing and flood zone determination services.  To this end, the Prospectus defined the Company's principal growth strategies to include: (1) expanding the Company's flood outsourcing business; (2) expanding the Company's existing relationships with flood insurance outsourcing and flood zone determination customers to generate additional outsourcing business; (3) focusing on maximizing the Company's existing economies of scale to provide customers with more cost-effective services, and continuing to expand such efficiencies through greater utilization of the Company's existing infrastructure and databases; (4) expanding the Company's direct sales force and developing strategic relationships with other service providers; (5) generating recurring revenues by providing services based on long-term contractual relationships or based upon events which occur frequently in the course of a customer's business; and (6) pursuing strategic acquisitions that offer opportunities to increase market share or expand the Company's menu of outsourcing services.  At the time of the Offering, plaintiff and the Class understood that each of these announced goals were inexorably tied to the development of *both* the Company's insurance outsourcing services and its flood mapping business.

30.     Unbeknownst to shareholders, however, the management of the flood mapping and flood zone determination business was *not compatible* with the management of the other outsourcing service business and, as such, this segment of the Company's business could not possibly provide INMG with significant growth.  In fact, defendants have now admitted that the two business segments were "never compatible" and could not be integrated within INMG.  In fact, *the only reason the flood mapping business was grouped with the insurance outsourcing business in the first place was because it gave BIG an opportunity to sell its Geotrac assets to the public at a significant premium in conjunction with the sale of the other INMG assets during the Offering*.

31.     Moreover, the Offering not only allowed BIG to sell the incompatible Geotrac

- 12 -

assets but it also allowed BIG to create a trading market in INMG stock which, based on the Offering price, gave BIG an immediate $87 million increase in value of its INMG holdings. In addition, INMG also received more than $12 million in loans from a third party whose stock was registered and sold pursuant to the Offering, and the repayment of at least $10 million of debt which it was owed by the Company, which, but for the Offering, the Company had little ability to repay. In total, the Offering provided immediate value to BIG in excess of $100 million and, therefore, the successful completion of the Offering was imperative.

## FALSE AND MISLEADING STATEMENTS IN THE ROADSHOW PRESENTATIONS, REGISTRATION STATEMENT AND PROSPECTUS

32.     Prior to February 1999, in connection with the Offering, representatives of the Lead Underwriters conducted telephone conferences and met in person with potential investors in several cities throughout the United States and presented an extremely positive picture of INMG's successful integration efforts, growth strategy and marketing programs. Representatives of INMG, including defendant Meehan, also participated in oral presentations which included demonstrative presentations which stressed that INMG was successfully integrating the flood mapping business with the insurance outsourcing services business, and was successfully executing its strategy of increasing sales to existing customers. These positive statements about INMG's current operations and past performance were consistent with the statements made by the defendants in the Registration Statement and Prospectus.

33.     Thus, to stimulate demand for INMG's shares to be sold in the IPO the Lead Underwriter Defendants conducted a multi-city roadshow during January 1999 wherein they and certain of the Individual Defendants (including defendant Meehan) traveled to, *inter alia*, New York City, Denver, Boston, Providence, Philadelphia and Los Angeles to meet with potential investors and present highly favorable information about INMG, which was much more positive than that contained in the IPO Prospectus, including forecasts of very strong revenue and profit growth in 1999 and 2000. During the Roadshow Presentations, they told potential investors:

- Since the flood mapping and insurance outsourcing businesses were complimentary they could be expected to create new business opportunities and create synergies that would increase revenues.

- 13 -

- Management was fully able to integrate Geotrac's flood mapping business with and into the Company's insurance outsourcing business.

- Investors could reasonably expect the stock to rise approximately 60% in value in the next 12 months and 100% in value over the next 24.

- INMG's earnings were predictable because 55% of the numbers are recurring based on INMG's proprietary links to the flood insurance market and in addition, aggressive new contract signings had broadened the firms' presence into all segments of personal and commercial lines insurance. Moreover, they represented that INMG's turnkey outsourcing product would be a driving factor in obtaining new business.

- INMG was growing at 40%-plus and had the capability to maintain a 20% secular growth rate for the next five years.

- The Company had a sound business plan, an experienced management team and new capital, which they stated would allow INMG to successfully expand its revenue base with non-affiliated customers and grow earnings at an annualized rate of at least 20% over the next 18-24 months.

- INMG could be purchased at a compelling valuation as a pure play in the insurance processing and outsourcing fields with attractive earnings potential.

34.     The representations made by the Lead Underwriters and Individual Defendants reproduced above were materially misleading as they falsely represented that the Company expected to capitalize on significant growth presented, in part, by its flood mapping business, which would allow the Company to realize additional revenues and allow the Company to achieve synergies and economics of scale and to expand its outsourcing services. In addition, these statements were materially false for, among other reasons, the following:

(a)     The flood mapping business was not compatible with the Company's outsourcing services and synergies could not possibly be realized between the flood mapping and insurance outsourcing businesses such that expected future growth was well below these estimates;

(b)     As a result of the incompatible nature of the flood mapping and insurance outsourcing services, few if any cross-over selling opportunities existed, again, negatively impacting future growth expectations;

(c)     As a result of the problems which defendants were having integrating the flood mapping and insurance outsourcing services businesses, the Company could not

- 14 -

consolidate Geotrac into its operations nor could it access Geotrac's customer base as a means of generating meaningful additional revenue for the Company, thus making it impossible for INMG to meet analysts' expectations;

        (d)     As a result of the Company's inability to maximize any significant economies of scale through the use of the Company's separate and distinct databases no synergies could be expected;

        (e)     Due to the incompatible nature of the Company's flood mapping and insurance outsourcing businesses, Geotrac was not, could not and would not provide any significant growth opportunities for the Company; and

        (f)     As a result of the foregoing, the defendants had no reasonable basis to conclude that INMG expected to experience significant growth in its business or revenues.

       35.     Thus, having performed the Roadshow Presentations and after defendants were confident that their marketing efforts were successful, on February 11, 1999, the Company completed a 3.35 million share IPO of INMG stock priced at $11.00 per share, with gross proceeds totaling $36.85 million. Included in this Offering was up to 1.35 million shares sold by Venture Capital. Venture Capital immediately repaid BIG at least $12 million, which it realized through the sale of its INMG stock.

       36.     The Offering was accomplished via a Prospectus and Registration Statement filed with the SEC and signed by each of the Individual Defendants. Unbeknownst to investors at the time of the Offering, however, the Prospectus contained several material misrepresentations and failed to disclose material facts necessary to make the statements contained therein not false and misleading. Specifically, the Prospectus materially misrepresented facts relating to the Company's internal operations and capacities, and its ability to integrate and operate Geotrac with the Company's other line of business. The Prospectus failed to disclose that, as defendants later admitted, the flood mapping business was wholly incompatible with the Company's insurance outsourcing services. In addition, defendants also failed to disclose the substantial risk associated with investing in INMG.

37.     Rather than disclosing the problems which the Company was having integrating the Geotrac assets, and that synergies between the flood mapping business and the insurance outsourcing business could not possibly be realized, the Prospectus stated:

> The acquisition of Old Geotrac (the "Geotrac Acquisition") *strengthens the Company's position as a leader in the flood zone determination business* and broadens the range of flood data services the Company is able to provide. In addition, *the Company is in the process of consolidating its own flood zone determination operations with those of Old Geotrac in an effort to realize economies of scale.* Finally, *the Company believes that access to Old Geotrac's customer base of financial institutions and insurance companies will facilitate cross-selling opportunities and expansion of the Company's outsourcing services.*

38.     The statements contained in the Prospectus as detailed in ¶37 above were materially misleading as they falsely represented that the Company expected to capitalize on significant "cross-selling opportunities" presented by its flood mapping business, which opportunities would allow the Company to realize additional revenues and to expand its outsourcing services.  Moreover, the representation that the Geotrac acquisition "strengthens the Company's position as a leader in the flood zone determination business," and that the Geotrac acquisition would allow the Company to realize economies of scale, were each false and misleading when made. In addition, the statements contained in the Prospectus were materially false at the time of the Offering for, among other reasons, the following:

(a)     The flood mapping business was not compatible with the Company's outsourcing services and synergies could not possibly be realized between the flood mapping and insurance outsourcing businesses;

(b)     As a result of the incompatible nature of the flood mapping and insurance outsourcing services, few if any cross-over selling opportunities existed;

(c)     As a result of the problems which defendants were having integrating the flood mapping and insurance outsourcing services businesses, the Company could not consolidate Geotrac into its operations nor could it access Geotrac's customer base as a means of generating meaningful additional revenue for the Company;

(d)     As a result of the Company's inability to maximize any significant

- 16 -

economies of scale through the use of the Company's separate and distinct databases no synergies could be expected; and

       (e)    Due to the incompatible nature of the Company's flood mapping and insurance outsourcing businesses, Geotrac was not, could not and would not provide any significant growth opportunities for the Company.

     39.    In addition to the false representations regarding synergies between the flood mapping services and the outsourcing services, the Prospectus also created the materially misleading impression that INMG was well positioned to capitalize on foreseeable and expectant growth in demand for the Company's flood mapping services. In this regard, defendants created the materially false impression that the Company was already capitalizing and could continued to capitalize on growth in its flood zone determination business as a result of the continuing demand which would be driven by the following factors:

> – ***Higher Levels of Compliance with Federal Flood Laws***. The 1994 Reform Act has compelled mortgage lenders to enforce federal flood insurance requirements or be subject to substantial monetary penalties. As a result, a higher percentage of purchasers of residential property located in federally designated high-risk flood zones are being required to purchase flood insurance as a condition to receiving mortgage financing from a federally-backed financial institution....

> – ***Increase in Voluntary Purchase of Flood Insurance***. The Company expects the number of property owners who purchase flood insurance on a voluntary basis to increase over the next several years. Management believes consumers are increasingly aware that affordable flood insurance is available to them through the Flood Program....

> – ***Growth in Commercial Flood Zone Determination Business***. The demand for flood zone determinations by commercial property insurers and commercial mortgage lenders has increased recently and the Company expects this growth pattern to continue.

     40.    The statements detailed in ¶39 above were each false and misleading as detailed in ¶¶34, 36 and 38 above. Moreover, because the Company could not integrate its flood mapping business into its other business, INMG was not positioned to capitalize on any purportedly positive industry trends.

     41.    The Company's Prospectus was also materially false and misleading because it failed to disclose existing adverse conditions which were affecting the Company at the time of

- 17 -

the Offering and which would continue to have an adverse effect on the Company, including the

fact that the Geotrac assets were not compatible with INMG's other assets or that economies of

scale were impossible to achieve. Rather, the Prospectus falsely represented such events as

future contingencies, stating:

> On July 31, 1997 the Company acquired a 49% equity interest in Old
> Geotrac. In July, 1998, the Company acquired the remaining 51% equity interest
> in Old Geotrac. The Company is in the process of consolidating its existing flood
> zone determination operations with those of Old Geotrac in an effort to realize
> economies of scale. There can be no assurance, however, that the Company will
> be able to integrate the operations of Old Geotrac with its own operations, or that
> such economies of scale will be realized. ***The failure to successfully integrate its
> own operations with those of Old Geotrac could have a material adverse effect
> on the Company's business, financial condition and results of operations***.

42.    The statements in ¶41 above, were materially false and misleading for the reasons

stated herein in ¶¶34, 36 and 38. In addition, these statements were false and misleading at the

time of the Offering because they represented as mere contingencies the difficulties associated

with integrating Geotrac into the Company which the Company was then experiencing. While

the Prospectus claimed that "[t]he failure to successfully integrate its own operations with those

of Old Geotrac ***could*** have a material adverse effect on the Company's business, financial

condition and results of operations," in fact, at the time of the Offering the material adverse effect

was ***already*** occurring. At the time of the Offering, the inability of INMG to integrate its flood

mapping business with its outsourcing services business was having, and would continue to have,

a material adverse effect on the Company because of the significant drain this imposed on the

Company's resources.

43.    At the time of the Offering, the Company's only two lines of business were ***not***

compatible and the problems involved with integrating Geotrac with the insurance service

outsourcing business were preventing the Company from operating efficiently and according to

its announced business plan. The Prospectus omitted and failed to disclose these true adverse

conditions and merely warned of normal market risks, such as external competitive forces, which

could ***possibly*** affect the Company at some later time. In this regard, the Prospectus stated the

following:

- 18 -

> There can be no assurance that the Company will be able to compete successfully against current and future competitors, or that competitive pressure faced by the Company will not have a material adverse effect on its business, financial condition and results of operations.

44.     The statements in the Prospectus, reproduced in part in ¶43 above, regarding the ability of the Company to compete successfully against competitors were materially false and misleading for the reasons stated herein in ¶¶34, 36 and 38.  In addition, these statement were false and misleading at the time of the Offering since, at that time, the Company was already at a significant competitive disadvantage as a result of the loss of management's focus on flood mapping, and as a result of the drain on Company resources the flood mapping business had become.  Thus, as a result of managements' inability to integrate these businesses, at the time of the Offering the Company's ability to effectively compete in the flood mapping market was *already* significantly impaired.  Defendants were obligated to disclose this impairment and the failure to do so rendered false any positive statements regarding growth, synergies or the ability of the Company to complete successfully in their market.

## THE TRUTH IS BELATEDLY REVEALED

45.     Beginning on September 29, 1999, the Company issued a series of statements which revealed, for the first time, the true financial and operational problems that existed at the Company on February 11, 1999.  These belated admissions revealed that at the time of the Offering, the Company had been  experiencing severe operational difficulties related to the integration of Geotrac.  The first of these statements was made on September 29, 1999, at which time the Company issued a press release, published on *Business Wire*, which stated, in substantial part, the following:

> *Insurance Management Solutions Group, Inc. today reported that it has lowered its earnings expectations for the third quarter ended September 30, 1999 and for the fiscal year ending December 31, 1999, primarily due to continued weakness in the Company's flood zone determination business as well as lower than expected outsourcing services revenue.*
>
> \*   \*   \*
>
> During the past several months, the Company has made progress in adjusting the expense structure of its flood zone determination operations to match its revenue base.  However, even upon the completion of such expense structure adjustments,

the Company does not expect its flood zone determination operations to achieve previous levels of profitability for the foreseeable future.

...This is attributable to several factors, including lower than expected claims outsourcing revenues resulting from lower than anticipated storm activity, as well as lower than expected policy outsourcing revenues resulting from lower than anticipated premium volumes experienced by many of the Company's affiliated and unaffiliated clients.... In order to adjust for these shortfalls, the Company has begun to implement many cost control strategies that are designed to better monitor profitability at the individual product and customer level.

Howard added, "Although we are disappointed with the revised projections, *we believe the cost control strategies that are being implemented will better enable us to monitor expenses so as to align them with recent trends and anticipated demands. In addition to striving for improved corporate efficiencies, we continue to explore opportunities for new services that will better position [INMG] for the year 2000 and beyond. We will continue to bring strategic value to our clients, while looking for ways to enhance shareholder value. We remain very optimistic about the future of our business.*"

46.    The press release detailed in ¶45 above revealed for the first time the significant and material problems the Company had been having in providing flood mapping services.  In addition to this press release, soon thereafter, the Company also issued another release announcing dismal third quarter results and that the Company had retained Raymond James to "Pursue Strategic Alternatives For Flood Zone Determination Business."

47.    As reported in the *St. Petersburg Times* on October 29, 1999, the Company now admitted that the flood zone mapping business was a "*strategic misfit from the start*," and that the Company was looking to sell its flood zone mapping operations in order to focus solely on its insurance outsourcing business.  As evidence of the foregoing, the *St. Petersburg Times* reported the following:

Howard, a Bankers executive recruited to reorganize [INMG] in August, said *flood mapping never fit with the outsourcing business*. He declined to categorize the purchase of Geotrac as a mistake but said *the unit would have "better synergies" if linked to a mortgage provider.* "Geotrac ... was not bringing value to what we do," he said in an interview Thursday.  "*We are focusing purely on insurance outsourcing.  That is our goal.*"

48.    This shocking admission, as well as the statements made in ¶¶45 and 46 above were in stark contrast to the statements made in the Prospectus and during Roadshow Presentations regarding the flood mapping business and Geotrac.  Unlike the Prospectus, which represented that Geotrac and the flood mapping business *was a high-growth, high-profit line of*

*business which would allow the Company to realize synergies and cross-marketing*

*opportunities*, the statements made in the *St. Petersburg Times* article confirm that the flood

mapping business was never compatible with the Company's other line of business.

## CLASS ACTION ALLEGATIONS

49.     This is a class action on behalf of all persons who purchased INMG stock

pursuant and/or traceable to the February 11, 1999, false and misleading Registration Statement

and Prospectus (the "Class"), excluding defendants and their affiliates.  Class members are so

numerous that joinder of them is impracticable.

50.     Common questions of law and fact predominate and include whether:

(i) defendants violated the 1933 Act; (ii) the Registration Statement/Prospectus was false and/or

misleading; and (iii) the extent of and appropriate measure of damages.

51.     Plaintiff's claims are typical of those of the Class.  Prosecution of individual

actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the

interests of the Class.  A class action is superior to other available methods for the fair and

efficient adjudication of this controversy.

## FIRST CLAIM FOR RELIEF

### (Against all Defendants for Violations
### of Section 11 of the 1933 Act)

52.     Plaintiff repeats and realleges each and every allegation contained above as if fully

reproduced hereunder and pursuant to the Claims herein.

53.     This Claim for Relief is brought by plaintiff pursuant to §11 of the 1933 Act, 15

U.S.C. § 77k, on behalf of the Class, against all defendants.

54.     The Registration Statement and Prospectus issued in connection with the

February 11, 1999 Offering of 3.35 million shares of INMG common stock priced at $11.00 per

share, which raised total aggregate proceeds of $36.85 million, was inaccurate and misleading,

contained untrue statements of material facts, omitted to state other facts necessary to make the

statements made not misleading, and concealed and failed adequately to disclose material facts as

described above.  Specifically, the Registration Statement and Prospectus each failed to disclose

- 21 -

and concealed the true fact that the Company's flood mapping subsidiary could not be integrated into the Company's operations, and as such, it would not provide synergies or future revenue growth as falsely represented by the defendants. This omission, therefore, was a violation of SEC Regulation S-K, Item 303(a), which requires that trends and conditions which are having and will continue to have an adverse effect on the registrant's operating results must be disclosed.

55.    The Company is the registrant for the Offering. As the issuer of the IPO shares, INMG is strictly liable to plaintiff and the other members of the Class for the material misstatements in and omissions from the Registration Statement and Prospectus.

56.    The Defendant Underwriter Class, guided by the Lead Underwriter Defendants, sold stock in the Offering as defined in §11(a)(5) of the 1933 Act. The Defendant Underwriter Class was, therefore, responsible for the contents and dissemination of the Registration Statement and Prospectus.

57.    As underwriters of the Offering, each member of the Defendant Underwriter Class owed to the purchasers of the shares of INMG, including plaintiff and the other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus at the time it became effective, to ensure that said statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The Defendant Underwriter Class knew, or in the exercise of reasonable care, should have known of the material misstatements and omissions contained in the Prospectus as set forth herein. As such, the Defendant Underwriter Class is liable to plaintiff and the other members of the Class.

58.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were true, did not omit any material facts and were not misleading.

59.    Each of the defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public which were contained in the Registration Statement and Prospectus, which misrepresented or failed to

disclose, *inter alia*, the adverse facts set forth above.  By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

60.     Plaintiff and the other members of the Class acquired shares pursuant and/or traceable to the IPO and issued pursuant to the Registration Statement and Prospectus.

61.     Plaintiff and the other members of the Class have sustained damages.  The value of their shares has declined substantially subsequent to, and due to, defendants' violations.

62.     At the times they purchased shares, plaintiff and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to September 29,1999.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that plaintiff filed this Complaint.  Less than three years have elapsed from the time that the securities upon which this Claim for Relief is brought were *bona fide* offered to the public to the time plaintiff filed this Complaint.

## SECOND CLAIM FOR RELIEF

### (Against All Defendants for Violations Of
### Section 12(a)(2) of the 1933 Act)

63.     Plaintiff repeats and realleges each and every allegation contained above.

64.     This Claim for Relief is brought by plaintiff on behalf of himself and the Class pursuant to §12(a)(2) of the 1933 Act, 15 U.S.C. §77l(a)(2).

65.     The defendants named in this Claim for Relief were sellers, offerors, and/or solicitors of sales of the shares offered and sold in connection with the Offering.

66.     The actions of solicitation taken by the defendants named in this Claim for Relief included participation in the preparation and dissemination of the false and misleading Prospectus and the Roadshow Presentations.  The written and oral communications made in connection with the Roadshow Presentations and Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading and failed to disclose material facts.

67.     The Defendant Underwriter Class on behalf of the underwriting syndicate offered

- 23 -

for sale and sold the shares purchased by plaintiff and the Class and received over $2.579 million in fees for doing so.

68. Each defendant named in this Claim for Relief solicited and/or was a substantial factor in the purchase by each member of the Class of INMG common stock. But for the participation by these defendants, including the solicitation by these defendants as set forth herein, the Offering could not and would not have been accomplished. The defendants named herein participated in the acts detailed in ¶¶32-33, 36-37, 39, 41 and 43, as follows:

(a) They actively and jointly drafted, revised, and approved the Prospectus and other written selling materials by which the Offering was made to the investing public. These written materials were "selling documents," calculated by these defendants to create interest in INMG common stock and were widely distributed by defendants for that purpose;

(b) These defendants finalized the Registration Statement and Prospectus and caused them to become effective. But for these defendants having drafted, filed, and signed the Registration Statement and Prospectus, the Offering of INMG common stock could not have been made; and

(c) These defendants conceived and planned the Offering and together jointly orchestrated all activities necessary to effect the sale of these securities to the investing public, by issuing the securities, promoting the securities, supervising their distribution and ultimate sale to the investing public.

69. The defendants were obligated to make a reasonable and diligent investigation of the written and oral statements made in the Prospectus, selling sheets and Roadshow Presentations, to insure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

70. Plaintiff and the other members of the Class purchased or otherwise acquired INMG shares pursuant to the defective Registration Statement and Prospectus. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and

omissions contained in the Prospectus or selling sheets or made in connection with the Roadshow Presentations.

71.     Plaintiff hereby tenders to defendants those securities which plaintiff and the other members of the Class continue to own, on behalf of all members of Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.

72.     By reason of the conduct alleged herein, these defendants violated, and/or controlled a person who violated, §12(a)(2) of the 1933 Act.  As a direct and proximate result of these violations of §12(a)(2), plaintiff and the other members of the Class sustained substantial damages in connection with the purchase of INMG stock.  On behalf of all members of the Class who still hold their INMG shares, plaintiff seeks rescissory damages.  Accordingly, plaintiff, on behalf of all members of the Class who continue to own such securities, seeks to exercise his right to rescind and recover the consideration paid for his INMG shares and hereby elects to rescind and tender all INMG shares held by members of the Class to the defendants sued herein.

73.     Less than three years has elapsed from the time that the securities upon which this Claim for Relief is brought were sold to the public to the time of the filing of this action.  Less than one year has  elapsed from the time when plaintiff discovered or reasonably could have discovered the facts upon which this Claim for Relief is based to the time of the filing of this action.

### THIRD CLAIM FOR RELIEF

**(Against Defendants BIG, INMG, Meehan, R.M. Menke,
R.G. Menke and White for Violations of
Section 15 of the 1933 Act)**

74.     Plaintiff repeats and realleges each and every allegations contained above.

75.     This Claim for Relief is brought pursuant to §15 of the 1933 Act, 15 U.S.C. §77o, against defendants INMG, BIG, Meehan, R.M.  Menke, R.G. Menke and White.

76.     Defendant Meehan, R.M. Menke, R.G. Menke, White and BIG, by reason of their stock ownership, management position and/or membership on the Company's Board of Directors,

were controlling persons of the Company and had the power and influence, and exercised the same, to cause INMG to engage in the violations of law complained of herein.  Defendants Meehan, R.M. Menke, R.G. Menke, White and BIG are liable under §15 of the 1933 Act.

77.    INMG controlled each of the Individual Defendants and is liable for their acts pursuant to §15 of the 1933 Act.

## PRAYER

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; equitable relief, including, but not limited to recission; and such other relief as the Court may deem proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: September 27, 2000

MILBERG WEISS BERSHAD
HYNES & LERACH LLP

By: _____
    Kenneth J. Vianale
    (Fla. Bar No. 169668)
    Jack Reise
    (Fla. Bar No. 058149)

The Plaza, Suite 900
5355 Town Center Road
Boca Raton, FL  33486
Telephone:  561/361-5000
Facsimile:  561/367-8400

- and -

William S. Lerach
Darren J. Robbins
Michael A. Swick
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone:  619/231-1058
Facsimile: 619/231-7423

**CAULEY & GELLER, LLP**
Paul J. Geller
One Boca Place, Suite 421A
2255 Glades Road
Boca Raton, FL  33431
Telephone:  561/750-3000

**Attorneys for Plaintiff**